**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

      v.

MICHAEL BENTLEY

    Defendant.

24 CR 0142

**<u>DEFENDANT MICHAEL BENTLEY'S SENTENCING MEMORANDUM</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

DEFENDANT'S SENTENCING MEMORANDUM ......................................................... 1

I. IN CONSIDERING THE §3553(a) FACTORS, MICHAEL'S PERSONAL HISTORY AND CHARACTERISTICS, A SENTENCE OF 24 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO MEET THE PURPOSE OF PUNISHMENT ............................................................................ 1

    A. Procedural history which led to Michael's plea of guilty ................................. 2

    B. Michael was raised in a loving two-parent family, but his sister and mother struggled with chronic illness and he often felt neglected as a child .............. 2

    C. Michael was violently beaten up and carjacked when he was just 17 ............. 7

    D. Since childhood, Michael has lost many friends to street violence, too numerous to recall with specificity ................................................................... 9

    E. Michael's kindness, generosity, empathy, and bravery have benefitted the lives of family, friends, co-workers, and strangers, alike ................................ 12

    F. Michael's son, Marlo, is the center of his world and Michael supports him in every way possible ........................................................................................... 16

    G. Michael has plans for the future, which include returning to his work as a truck driver, reconnecting with his loved ones, learning from the events that led to his involvement in this case, and continuing to evolve as a changed man ........................................................................................................................ 21

II. A SENTENCE OF 24 MONTHS, FOLLOWED BY SUPERVISED RELEASE, AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, PROTECTS THE PUBLIC FROM FURTHER CRIME, AND OTHER POLICY CONSIDERATIONS ........................................................................................................ 23

    A. Michael's background, education, employment history, and age reflect that he has a low risk of recidivism ........................................................................ 23

    B. Michael's own attitude reflects that he has a low risk of recidivism ............. 25

**III.**     **ENHANCEMENTS TO THE BASE OFFENSE LEVEL OVERSTATE MICHAEL'S CULPABILITY AND DRIVE THE GUIDELINE** .............................. 28

      **A. Two point enhancement for gun possession overstates Michael's culpability** ................................................................................................................ 28

      **B. Drug amount drives guidelines and overstates Michael's culpability** ........... 29

**IV.**     **THE PSR** ................................................................................................................ 30

**V.**     **OBJECTIONS TO PRESENTENCE REPORT** .......................................................... 31

**VI.**     **CONCLUSION** ....................................................................................................... 31

## TABLE OF AUTHORITIES

**CASES**

*Gall v. United States,* 552 U.S. 38 (2007) ................................................................... 1

*Koon v. United States,* 518 U.S. 81 (1996) ................................................................. 1

*Pepper v. United States,* 562 U.S. 476 (2011) ............................................................ 1

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................. 1

*United States v. Diaz,* 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) ........................... 29

*United States v. Dossie*, 851 F.Supp.2d 478 (E.D.N.Y. 2012) ................................... 29

*United States v. Hanson,* 561 F. Supp.2d 1004 (E.D. Wis 2008) ............................... 24

*United States v. McGee,* 479 F.Supp.2d 910 (E.D. Wis 2007) ................................... 25

*United States v. Qualls,* 373 F.Supp.2d, 873 (E.D. Wis 2005) .................................. 25

*United States v. Thomas*, 595 F.Supp.2d 949 (E.D Wisc. 2009) ................................ 30

*United States v. Ward,* 814 F.Supp. 23 (E.D. Va 1993) .............................................. 24

*United States v. Woody*, 2010 WL 2884918, at *9 (D. Neb. July 20, 2010) ............... 30

**STATUTES**

18 U.S.C § 3553 ...............................................................................................1, 2, 23, 28

**OTHER AUTHORITIES**

Aidan Cahill, Opinion, *Stop Treating Gun Violence Like its Normal*, The Loyola Phoenix, (February 21, 2024) .................................................................................................... 11

Duignan, B.*, Great Recession,* Encyclopedia Britannica ............................................. 6

Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, National Institute of Justice, (March 1, 2017) ............................................................ 19

Greg Rosalsky, *How the 'Black Metropolis' made a comeback*, Planet Money: National Public Radio (Oct. 4, 2022) ................................................................................................... 7

Jill D. Mcleigh, Editorial, *The New Normal? Addressing Gun Violence in America*, 85 American Journal of Orthopsychiatry 201 (2015) ..................................................................... 11

Laura Clawson, *What Happens to Kids' Learning if Dad Is Incarcerated?* JSTOR Daily, (July 19, 2025) .................................................................................................................. 19, 20

Marie Miguel, *PTSD is not just for veterans, it's a trauma disorder that affects millions*, UAB Institute for Human Rights Blog, The University of Alabama at Birmingham (June 5, 2019) ..... 9

Medline Plus, *Post-Traumatic Stress Disorder*, National Library of Medicine, U.S. Department of Health and Human Services ................................................................................................. 9

Nicholas Zill, *When A Parent Goes To Prison, What Happens To The Kids?*, Institute of Family Studies, (March 18, 2025) ................................................................................................18, 19

*Post-Traumatic Stress Disorder*, National Institute of Mental Health .......................................... 9

Rachel Treisman, *The surgeon general declared gun violence a public health crisis. What does that do?*, NPR, (June 25, 2024) ................................................................................................. 11

*Recidivism Rates: What you need to know*, Council on Criminal Justice (Sept. 1, 2021) ......23, 24

*The Effects of Aging on Recidivism Among Federal Offenders*, United States Sentencing Commission (Dec 7, 2017) ..................................................................................................... 24

*U.S. News and World Report ranks Whitney Young as number 4 of 149 high schools in the Chicago Public Schools for 2025-2026, and 104 nationally. Young Magnet High School*, U.S. News and World Report .......................................................................................................... 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

       v.

                                     Judge Jeffery I. Cummings

                                     24 CR 0142

MICHAEL BENTLEY

    Defendant.

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

Defendant, Michael Bentley, by his attorneys, Bedi & Singer, LLP, respectfully requests, pursuant to 18 U.S.C § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005) and its progeny, that this Court impose a sentence of 24 months. In support of this request, Michael states as follows:

I.    **IN CONSIDERING THE §3553(a) FACTORS, MICHAEL'S PERSONAL HISTORY AND CHARACTERISTICS, A SENTENCE OF 24 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO MEET THE PURPOSE OF PUNISHMENT**

When imposing a sentence, the United States Supreme Court has determined a defendant's history and characteristics are "clearly relevant to the selection of an appropriate sentence," and each sentence must "fit the offender and not merely the crime." *Pepper v. United States,* 562 U.S. 476, 488, 492 (2011). The sentencing court must "make an individualized assessment based on the facts presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *Koon v. United States,* 518 U.S. 81, 113 (1996) (The sentencing judge "consider[s] every convicted

1

person an individual and every case as a unique study in the human failing that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."). In considering all the §3553(a) factors, this Court will gain a fuller and clearer picture of Michael. Based on Michael's age, limited criminal background, education, work history, life changes, and family support, a sentence of 24 months is appropriate. Finally, and perhaps most importantly, the most recent conduct in this case occurred over four years prior to the date Michael was charged.

### A. Procedural history which led to Michael's plea of guilty

On March 14, 2024, Michael was indicted with multiple counts of possession with intent to distribute a controlled substance, for conduct that occurred between May 14, 2019 and February 2020. (PSR, ¶1). On September 23, 2025, Michael entered a plea of guilty to Count Nine of the indictment. (PSR, ¶3). His plea agreement also contains relevant conduct relating to the conduct which occurred between August 1, 2017 to February 2020. (PSR, ¶4). This is an extremely serious crime and the extent of the offense has been accurately set forth in the PSR and the Government's version of the offense. Michael has accepted responsibility through his admission of guilt and his written plea agreement. As is discussed more fully below, Michael is not the same person as he was when this conduct occurred.

### B. Michael was raised in a loving two-parent family, but his sister and mother struggled with chronic illness and he often felt neglected as a child

Michael was born in Chicago, Illinois on March 25, 1989, to Pharrell (Ray) and Dr. Michelle Bentley. (PSR, 50). His parents have been married for about 40 years. (PSR, ¶50). His father, age 70, is retired from a lifetime of community service, including working as the Chief Administrative Officer for the Cook County Public Defender's Office, the Director of Operations for the Cook County Clerk's Office and First Deputy Budget Director for the Chicago Public Schools. (PSR, ¶50, Ex. 4). His mother, age 76, is a retired minister and educator, who served

2

Chicagoland for over 50 years: from a GED instructor to Cabrini-Green young adults, to the principal of a high school for serious male offenders in Project New Pride, to the Dean and faculty of a theological seminary, senior pastor to several churches, a director, a hospital chaplain, and a consultant for the Cook County Public Defenders Office. (PSR, ¶50, Ex. 2). Michael also has a sister, Kya, who is 13 years older. (PSR, ¶51).[1] Despite their age difference, he is close to his sister. Kya describes how much she adored Michael, from the time he was born. "I remember the day my parents told me I was going to have a little brother. At first I wasn't thrilled, but over time my excitement grew, and I embraced my new role. When Michael was born, we shared a room, and I loved it. Whenever he cried, I'd jump up, even when my mom told me it wasn't my job. I took being a big sister very seriously." (Ex. 3). Kya and his parents have been there for him as he confronts these charges. (PSR, ¶51).

Michael experienced a "very loving and supportive" childhood," raised by his parents, with the assistance of both maternal and paternal grandparents and his older sister, who was like a second mother to him. (PSR, ¶52). Michael's mother writes, "Michael grew up in a happy, healthy two-parent, with a big sister and dog household. It was a family affair for Michael with loving and doting maternal and paternal grandparents, aunts, cousins and caring neighbors, all of whom lived near and cared for and supported him with tough and unconditional love, and continue to do so. He experienced family trips to the south and east to visit extended family and have fun along the way. He experienced sports and YMCA camps. With two hardworking parents, Michael didn't really want for much." (Ex. 2).

Michael remembers his childhood a bit differently. He recalls that his parents often struggled financially. (Ex. 1). He relates, "[my parents] scrambled to create insulation against trying times while also repaying student loans and both attending advanced degree programs."

---

[1] Michael's father, Ray Bentley, indicated to probation that Kya is Michael's maternal half-sister.

3

(Ex. 1). His parents were able to provide him with basic needs and gifts at the holidays; but if there were any extras that he wanted, but did not "need," he was responsible for buying them with money he earned through after-school jobs and other hard work. (PSR, ¶53).

Michael was raised in the Bronzeville neighborhood on the south side of Chicago. (PSR, ¶52). He related there were "normal" Chicago problems in Bronzeville, such as violence and drug sales; however, they did not affect him until he got older. (PSR, ¶52).[2]

Everything was going well for Michael at home, until the 5th grade, which he recalls vividly. (PSR, ¶54). Although Michael is now in his late 30s, he still remembers this as a crucial turning point in his life. This was a period of time in which Michael's family became overwhelmed by illness and as a result, Michael felt neglected by his family. (PSR, ¶54). His sister, Kya, suffered from severe sickle cell anemia and would go into a full blown crisis two or three times a year. (PSR, ¶54). Each of these episodes lasted for extended periods of time, during which she was often hospitalized for weeks at a time. (PSR, ¶54). When Michael was in 5th grade, however, his mother was hospitalized at the same time as his sister. (PSR, ¶54). His mother had been diagnosed with lung cancer. (PSR, ¶54). Surgeons were able to remove her damaged lung, which saved her life. (PSR, ¶54). But she remained in the hospital for a very long time, at least it seemed so to a ten-year-old boy. (PSR, ¶54). This experience changed Michael's life.

Michael recalls that his mother and sister's simultaneous hospitalizations occurred in the late 1990s when children were not allowed on hospital floors, or at least on the floors where patients were being treated. So Michael spent a lot of time by himself trying to entertain himself in the hospital lobby. (PSR, ¶54). During this time, Michael did not feel he was getting the attention he needed and began to act out, at home and at school. (PSR, ¶54).

---

[2] His exposure to violence will be discussed below.

4

The situation became so grim that he would get into trouble almost every day to the point that, as he says, "I didn't even get in trouble. The principal had a seat in her office just for me and would have me sit there almost every day. My teacher would call home so much that she would end up forgetting about what I had done and just talk with my mother." (Ex. 1). While this was not the attention Michael craved, it was attention nonetheless, and he was grateful for just being noticed. Michael believes that during this time, he began to equate "doing wrong with getting the results I wanted." (Ex. 1).

Despite being a troublemaker in grade school, Michael actually thrived in an academic environment. (PSR, ¶85). He attended St. Thomas the Apostle for his first few years of grade school, but transferred to William Ray School for grades 3 through 6, where he received the perfect attendance award from Arne Duncan. (Ex. 4). The value of education was stressed throughout his childhood and Michael listened. He enrolled in Whitney Young High School's prestigious academic program for seventh and eighth graders, where he successfully transitioned into Whitney Young High School, considered one of the best Chicago Public Schools (CPS).[3] Michael excelled in school and enjoyed playing sports, including football, basketball and running track. (PSR, ¶55). He also spent time with his friends, riding bicycles, and playing video games. (PSR, ¶55). His mother remembers, "While studying at Whitney, Michael participated in sports, chess club and went to proms. During those six years (including 7th and 8th grade), I never received one negative report during parent-teacher conferences and I went to them all and many games and meets. Michael had a good reputation and rapport with his teacher and close friends.

---

[3] U.S. News and World Report ranks Whitney Young as number 4 of 149 high schools in the Chicago Public Schools for 2025-2026, and 104 nationally. *Young Magnet High School,* U.S. News and World Report https://www.usnews.com/education/best-high-schools/illinois/districts/chicago-public-schools/young-magnet-high-school-6551 (last visited Dec. 19, 2025).

Matter of fact, Mike won a CPS award from Mayor Daley for Perfect Attendance from kindergarten through 8th grade. And, of course, he attended church." (Ex. 2).

Michael graduated from Whitney Young High School in June 2007. He was proud to receive a scholarship to attend Florida A&M University in Tallahassee, Florida, for their five-year MBA program. (PSR, ¶86, Ex. 1). After completing three years, he transferred to DePaul University in Chicago, Illinois, between 2011 and 2012. (PSR, ¶86). After transferring to DePaul, Michael was unable to complete his degree, as his academic funding was exhausted and he could no longer afford to attend. (PSR, ¶86).[4] According to Michael's DePaul transcript, he had 79.5 transfer credit hours, and earned an additional 36 credit hours at DePaul. (PSR, ¶86). Although Michael was unable to complete his college education, he always valued the time he spent pursuing his degree.

Despite coping with severe and ongoing family illness, too much time spent on his own as a child, and what he perceived as his family's financial struggles, Michael never doubted his parent's love and support for him. His father acknowledges that he was not always available to his son because he worked so many hours. "My wife called me a workaholic; I do harbor some guilt for doing so much for other causes at the expense of time with my son." (Ex. 4). Even so, his parents tried to always be there for him while he was growing up. Their encouragement allowed Michael to thrive at school, earning a college scholarship, while trying to make a life for himself.

---

[4] Within a year after the time that Michael started college, the United States suffered the most consequential economic meltdown, since the Great Depression of 1929. "Altogether between late 2007 and early 2009, American households lost an estimated $16 trillion in net worth, one quarter of households lost at least 75 percent of their net worth, and more than half lost at least 25 percent. Households headed by younger adults, particularly by persons born in the 1980s, lost the most wealth, measured by a percentage of what had been accumulated by earlier generations in similar age groups. They also took the longest time to recover, and some of them still had not recovered even 10 years after the end of the recession. Those setbacks led some economists to speak of a "lost generation" of young persons who, because of the Great Recession, would remain poorer than earlier generations for the rest of their lives." Duignan, B., *Great Recession,* Encyclopedia Britannica, www.britannica.com/money/great-recession (last visited Dec. 30, 2025).

6

### C.  Michael was violently beaten up and carjacked when he was just 17

While growing up in Bronzeville, Michael was surrounded by what he refers to as "inner city" issues such as "some violence, some drugs," which Michael recalled as "the darkness and shadow of the city." (Ex.1, PSR, ¶52).[5] Michael also considered this as "normal stuff" which was common in "the inner city." Michael was so accustomed to his surroundings he says, "I did not see it as a problem as a child." (Ex. 1, PSR, ¶52). Michael frequently saw drugs being used and sold, gang activity, and random acts of street violence when he went outside to play or on his way to and from school. (Ex. 1). Yet, for the most part, he generally felt insulated from his turbulent surroundings. However, this view changed when he was unexpectedly, violently, and tragically, carjacked and pistol-whipped on his way to meet a girl he knew from school. (PSR, ¶52). He was a senior in high school. (PSR, ¶52). Michael believes he was set up by this girl and even now, Michael finds it "hard to talk about" this life-altering event. (Ex. 1). Although he knew who she was, she did not return to school following the incident. (PSR, ¶52).

He recalls that he was driving down an alley when his car was suddenly boxed in by another car. (Ex. 1). Michael was immediately confronted by a male Black who began to pistol-whip him in the face, while attempting to pull him out of the car. (Ex. 1). Michael still had his seat belt on and he floored the gas, drove through a fence, and managed to make his way into a McDonald's parking lot, where he stumbled into the restaurant, blacked out and collapsed on

---

[5] Bronzeville has a rich and illustrious history dating back to the 1920s. The neighborhood supported many Black artists and luminaries of the time, … However, the neighborhood began to decline as "economic decline led to social decay, and affluent Black residents left the area as it saw an explosion in crime, drugs, and violence. …The government helped facilitate Bronzeville's downturn, by among other things, building the Dan Ryan Expressway through the area, further segregating the community from the rest of the city. The government built massive housing projects throughout the neighborhood, including the Robert Taylor Homes. With 28 high-rises, each 16 stories tall, it formed the largest public housing project in the world….Originally pitched as a solution to poverty and residential overcrowding, the Robert Taylor Homes became a national symbol for everything wrong with the projects. …By the early 1990s, "Bronzeville had hit rock bottom. The neighborhood had less than half of the population it had back in the 1960s. Its stress had become a no man's land, filled with crumbling infrastructure, abandoned buildings and vacant lots." Greg Rosalsky, *How the 'Black Metropolis' made a comeback*, Planet Money: National Public Radio (Oct. 4, 2022)
https://www.npr.org/sections/money/2022/10/04/1126224645/how-the-black-metropolis-made-a-comeback

the floor. (Ex. 1). He remembers, "There was a lot of blood." (Ex. 1). Michael woke up in the ambulance before passing out again and being treated in the emergency room. (PSR, ¶70). Michael was hospitalized for three days. (Ex. 1). No one was ever arrested. (PSR, ¶52).

Michael's injuries were severe. (Ex. 1). His nose was broken and his lips had to be sewn back together. (PSR, ¶70). He could not eat solid food because his teeth were loose and he was confined to his bed for months. (PSR, ¶70). He was bedridden because his injuries made it difficult for him to move around. Though after a time, he preferred not to leave the house, because as he says, "My mind was messed up." (Ex. 1, PSR, ¶70). Michael was 17 years old and says quite simply, "I did not want to be seen." (PSR, ¶70).

This attack had a far-reaching and wide-ranging effect on Michael, mentally as well as physically. Michael experienced and received therapy for Post-Traumatic Stress Disorder following the attack. (PSR, ¶72). He explained that he continued to experience "residual effects" of the incident, including being startled by loud noises, feeling threatened and provoked, flashbacks, and feeling like the incident was recurring, prompting him to go into "survival mode." (PSR, ¶72).

As a result, Michael's mother referred him for counseling. (PSR, ¶72). Michael advised he participated in weekly counseling sessions with a mental health professional in Chicago, Illinois, for approximately six months. (PSR, ¶72). Michael related the counselor was "amazing" and the sessions were helpful. (PSR, ¶72). He does not recall why the sessions stopped after six months, though he has tried additional counseling on a few other occasions but has been unable to find a counselor whom he liked. (PSR, ¶72).

Research supports Michael's response to flashbacks when confronted with unexpected events, "It's normal to feel afraid during and after a traumatic situation. The fear triggers a

8

'fight-or-flight' response. This is your body's way of helping to protect itself from possible harm. It causes changes in your body such as the release of certain hormones and increases in alertness, blood pressure, heart rate and breathing."[6] According to the National Institute of Mental Health, "Anyone can develop PTSD at any age. This includes … people who have experienced or witnessed a physical or sexual assault, abuse, an accident, a disaster, a terror attack, or other serious events. People who have PTSD may feel stressed or frightened, even when they are no longer in danger."[7] "PTSD affects 3.5% of the U.S. adult population. That works out to eight million American people living with the condition… The root cause of PTSD is a traumatic event, but the symptoms are what overwhelm people to the point where it's diagnosable. People with PTSD often have recurring distressing and upsetting memories of the trauma, and when you continually have upsetting memories and can't stop them, it makes you want to shut down, which is a problem that many people face when living with PTSD … Symptoms can include flashbacks, night sweats, insomnia, panic attacks, and isolating from friends and family."[8] While Michael suffered with PTSD for many years, he has not dealt with symptoms for the last ten years. Michael experienced a life-altering event as a victim of violent crime.

### D. Since childhood, Michael has lost many friends to street violence, too numerous to recall with specificity

As Michael grew older, even aside from being personally attacked, he became aware of the precariousness of his neighborhood surroundings. Since childhood, he had witnessed criminal activity around him, but for many years, he was able to hold its effect at bay. However,

---

[6] Medline Plus, *Post-Traumatic Stress Disorder,* National Library of Medicine, U.S. Department of Health and Human Services, https://medlineplus.gov/posttraumaticstressdisorder.html (last visited Dec. 31, 2025).
[7] *Post-Traumatic Stress Disorder*, National Institute of Mental Health https://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-ptsd (last visited December 31, 2025).
[8] Marie Miguel, *PTSD is not just for veterans, it's a trauma disorder that affects millions,* UAB Institute for Human Rights Blog, The University of Alabama at Birmingham (June 5, 2019) https://sites.uab.edu/humanrights/2019/06/05/ptsd-is-not-just-for-veterans-its-a-trauma-disorder/.

9

once he experienced the personal impact of gun violence and the tragedy of gut-wrenching loss, his life was altered forever.

While it was not Michael's earliest loss, the murder of his friend, Malik Dunlap was probably his most significant. Michael had been friends with Malik since they were in the third grade. (Ex. 1). They were inseparable, would share each other's clothes and spend the night at each other's homes just about every week. (Ex. 1). On June 1, 2011, at 1:00 am, Malik was shot in what Michael believes was a targeted attack. (Ex. 5). Witnesses said they saw a group of males walk into a gangway in the 5500 block of South Princeton Avenue. (Ex. 5). A short time later, witnesses heard gunshots, saw the group emerge from the alley and flee in a van. (Ex. 5). Malik was found dead at the scene. (Ex. 5).

Michael's world was turned upside down. In the aftermath of Malik's murder, Michael remembers crying and drinking himself "numb." (Ex. 1). He bought a bottle of Remy Martin, took it to the park, and consumed it until he could no longer feel the unendurable pain. (Ex. 1). No one was ever arrested. Recently, Michael was reminded of Malik's murder, when he happened to be watching a YouTube video of a young man who was rapping about Malik's shooting. (Ex. 1). The rapper, himself, had just been murdered. (Ex. 1).

Shortly before losing Malik, Michael's friend, Ismail Robinson, was murdered on April 30, 2011. (article). Like Malik, Michael had also attended Kenwood Grade School with Ismail. (Ex. 1). Police found his body on the curb at 50th and Drexel. (Ex. 1). He had been shot to death. (Ex. 1).

When Michael was 16 or 17, he lost another grade school friend to street violence. His name was "Arthur." (Ex. 1). In the intervening years, Michael has forgotten his last name, but he cannot forget the impact of this death on his young life. (Ex. 1). Michael recalls that he lost at

10

least four or five more friends to shootings. He says, "At some point, I had all of the articles (about my friend's murders), but I have lost them along the way." (Ex. 1)

These numerous deaths have had an inestimable effect on Michael's life. He says, "The most twisted part of [losing my friends] is that it became my normality. (Ex. 1). This is what I thought was normal and it affected how I dealt with my problems. At a young age, I felt like I had to fight for my life." An editorial from the American Journal of Orthopsychiatry quotes a columnist who described a similar phenomenon as follows, "It shocks us. It always shocks us. Particularly when it happens in the state where we live, the country where we live, the city where we live…We tell each other how horrible it is. Because that's true, but we're not surprised. One of the worst things about news like this is that *horrible news is the new normal*." [emphasis in original].[9] While this comment refers to the prevalence of mass shootings and how they affect us when we hear about them on television or read about them in the newspaper, one can only imagine the extraordinary shock of hearing about a shooting when you knew the victim.

Furthermore, emerging research reflects that "Gun violence in the United States is treated as something normal. In Chicago, someone has been made a victim of gun violence everyday this year as of Feb 20 (2024), reaching a grand total of 233 victims in less than 100 days, according to the City of Chicago. Nationwide in 2021, 44,701 people died due to firearms, according to the Center for Disease Control."[10] In 2024, for the first time ever, the Surgeon General of the United States declared gun violence a public health crisis and indicated it should be treated as such.[11]

---

[9] Jill D. Mcleigh, Editorial, *The New Normal? Addressing Gun Violence in America,* 85 American Journal of Orthopsychiatry 201 (2015) (citing The Arizona Republic columnist E. J. Montini).

[10] Aidan Cahill, Opinion, *Stop Treating Gun Violence Like its Normal,* The Loyola Phoenix, (February 21, 2024) https://loyolaphoenix.com/2024/02/column-stop-treating-gun-violence-like-its-normal/

[11] Rachel Treisman, *The surgeon general declared gun violence a public health crisis. What does that do?*, NPR, (June 25, 2024) https://www.npr.org/2024/06/25/nx-s1-5018625/surgeon-general-vivek-murthy-gun-violence-public-health-crisis

In her letter of support, Michael's mother acknowledges the strife that Michael experienced through the violence he encountered, both toward himself and those whom he knew. After describing the positives in Michael's childhood and the advantages he had growing up, his mother pivots, "Wow. I've painted everything so rosy. While aware of several of Michael's negative experiences, he did receive counseling. Still, the unseen and hidden trauma deep inside Michael, simmered painful and confusing emotions, hidden scars, fears, and anxiety. Michael and many of our boys and youth-young men continuously suffer in silence due to their unresolved trauma from years of negativity their way. Michael has had experiences of guns pointed at his head and experiencing the death of good friends to gun violence, much more. Unresolved trauma for leisurely destruction. Trauma also experienced from simply being a smart African American boy, teen, young man living in the inner city of Chicago." (Ex. 2). The turbulent and violent circumstances surrounding Michael's young life, in which Michael played no part and was a victim, is why the requested sentence is appropriate.

### E. Michael's kindness, generosity, empathy, and bravery have benefitted the lives of family, friends, co-workers, and strangers, alike

Michael's kindness, generosity, empathy, and bravery have benefitted the lives of friends, family, co-workers and those whom he does not know. He has put his personal safety at risk to save the lives of imperiled strangers. In conversations with Michael's father, Ray Bentley, Mr. Bentley refers to his son as a "hero." In Mr. Bentley's letter, he describes Michael as "brave," "compassionate," and "a good human being." (Ex. 4). As an example, his father writes, "On September 28, 2019, Mike took me to a drag racing event in Madison, Illinois, since I am an avid drag racing fan. It was my first time ever attending a NHRA national event. He was tired and asked me to drive about halfway through the trip. About 2 minutes away from our hotel, I started merging into the right lane to exit the highway, when another car appeared to come out of

nowhere. I returned to my lane but the other driver lost control of the car and crashed into the front of the SUV then the rear of that car swung into the back pushing us into a tailspin. I fought for control and was able to bring the SUV to a stop, but the other car careened into the embankment and then stood on its nose and flipped over, trapping three youths inside. Mike jumped out of the SUV and pulled the driver out as smoke came from the engine, then he went for the rear passenger. I physically couldn't do much but Mike was committed to saving those kids. Ultimately, it took the fire department to free two trapped girls. I'll never forget that night. The fear I felt for those youth, and the pride I felt for the bravery and compassion of my son. The youth were not seriously injured. Even as a trucker, Mike has described accidents where he pulled over to help." (Ex. 4).

With his father's encouragement, Michael completed his Commercial Driver's License training on September 16, 2020. (Ex. 6). Since that time, Michael has been consistently employed. As a trucker, Michael encountered his own dangerous situation because he was placed at risk by other workers. Michael's father writes, "On Sunday, August 11, 2024, [Michael's] trailer was split in the center when some massive rolls of paper were not properly secured and crashed through the side, being visible through his mirror. He pulled over quickly and took all of the necessary precautions. The state trooper who responded to the call commended Mike for spotting the problem early and leaving the road before severe damage could occur, possibly threatening the safety of others. The trooper cited the company but took no action against Mike." (Ex. 4).

According to Michael, the accident occurred because he was assigned a truck that was unsuitable and dangerous for the heavy load he was carrying. Michael received a truck with a wooden floor, rather than a metal floor, and the wood split in half under the weight of the paper.

13

To compound issues, the truck had been improperly loaded. Michael's father writes, "To this day, his CDL has no infractions. Trucking can be a dangerous job - one that he takes very seriously." (Ex. 4).

Alea Smith, the mother of their 9-year-old son Marlo, also writes of Michael's gracious and generous nature, "Michael could meet a stranger on the street, in a store or a dentist's office and spark a conversation with them, leaving them smiling. I've always admired how great he is at getting people to see their potential or motivating them to aim for the stars. There were times when he would order 60-70 sandwiches from Subway or McDonald's and cases of water to pass them out to the homeless in various parts of the city and give them words of encouragement. Michael not only wanted to give back because it was in his heart to do so but he wanted to teach our son valuable lessons in helping the less fortunate, treating others with respect and life lessons in general." (Ex. 7).

Marlo's godmother, Jillian Shallow, expresses similar thoughts, "Mike embodies compassion, responsibility, and wisdom. As a close friend and godmother to his son, I have witnessed his dedication to his family, friends, and his own personal development, especially through his volunteer work with the suicide hotline, and his mentoring to a young man before his service in the United States Army." (Ex. 8).

As Ms. Shallow also writes, Michael volunteered for Crisis Text Line as a volunteer Crisis Counselor. There, he often communicated through the night with those confronting immediate and dire personal issues. Attached is a commendation from a Supervisor, "Michael used good contact techniques, validations, and strength IDs to help that texter feel supported and heard. Because of their genuine warm support, the texter got to that cool calm. Wonderful work! All of us at Crisis Text Line think you're pretty great. THANK YOU for being so dedicated to

14

our texters and our community. We really couldn't do it without you and your dedication." (Ex. 9).

Ms. Shallow also mentions in her letter that Michael informally mentored young men to help them find a constructive path, different from the one he led. Tracy Wells, a longtime friend, writes, "From my very first encounter with Michael, I was truly inspired and motivated by his intelligence and positivity. He has an extraordinary ability to uplift others, and his encouragement has motivated me to strive to be a better person. Michael has also played a pivotal role in my son's life. I reached out to him to be a mentor to my son, who at the time was having a few issues, and I am incredibly grateful that he said yes with *NO* hesitation. Michael took the time to connect with him by calling to talk, picking him up to go eat lunch, and speaking positivity with him. Michael's guidance has transformed my son's outlook and actions, and I am proud to say that my son is now serving our country in Alaska, a testament to the positive influence Michael has had on him. Michael possesses great potential to positively impact the lives of many young individuals. I truly believe that he can and will continue to make a difference to change lives for the better." (Ex. 10).

Minerva Fuentes is a colleague of Michael's at DMK Express. She discusses his extraordinary work ethic and his commitment to his co-workers and to the company. "Mr Bentley has consistently demonstrated a strong commitment to both professional and personal responsibilities. As a Logistics Coordinator at our company, Mr. Bentley has not only excelled in his duties but has also positively influenced those around him, often going above and beyond expectations. His dedication and work ethic are truly exemplary, and he has earned the respect of both his peers and supervisors." (Ex. 11).

15

Michael has also assisted family members in need. Michael's sister, Kya, recalls, "When I was hospitalized as a teen and young adult, Michael-once he was old enough -would come visit on his own and bring me little gifts to cheer me up." (Ex. 3). When he was older, Michael became a caregiver for his sister between 2011 and 2023, when she was suffering from sickle cell anemia and could not cope by herself. (PSR, ¶96). Although he was compensated some amount from the state, his priority was making sure Kya had someone near whom she knew and was devoted to her, rather than a stranger. (PSR, ¶96).

Michael also came through for those whom he did not know. Michael, like many, was appalled by the treatment of migrants in Chicago, newly-arrived from other countries. Unlike a lot of people, however, Michael was spurred to action. He understood that upon their arrival in Chicago, these individuals were often separated from their families, abandoned by a city with unfamiliar customs, faced with a language they did not write, speak or understand and weather for which they had no appropriate clothing or footwear. According to Michael's father, "when the migrant crisis occurred, Michael made it his personal mission to go to the migrant shelter at 22nd and Halsted. There, he was able to 'adopt' a Venezuelan family, which he did for weeks." (Ex. 4).

Attached are many more letters of support, too numerous to mention here. They are replete with examples of Michael's courage, kindness, generosity, bravery, thoughtfulness and giving nature and are why the requested sentence is appropriate.

### F. Michael's son, Marlo, is the center of his world and Michael supports him in every way possible

Michael's nine-year-old son, Marlo Alexander Bentley was born on May 12, 2016. Michael dotes on him, and Marlo is the center of Michael's world. Marlo adores his father and cherishes every minute they are able to spend together. Michael became a father at 27 and recalls

16

being involved in every aspect of Marlo's life, even before his birth, "from ultrasounds to baby showers." (Ex. 1). Michael said it "was amazing" becoming a dad." (PSR, ¶58). And it still is.

Michael and Marlo's mother, Alea Smith, are no longer together after a five-year committed relationship. However, they are determined to raise an emotionally, physically, and financially healthy son, who never doubts his parents' love. Alea writes, "Michael and I co-parent equally. As a father, he is top-tier. There were times when Michael would be frustrated with me wanting to take Marlo to visit my family in St. Louis because that would cut into his time, but he always agreed. In those moments it would bother me that he was frustrated but I still admired the fact that he cared about missing out on that time with Marlo. I honestly couldn't think about the idea of raising Marlo without him. Living in a big city with no family of my own and raising a child can be tough but Michael and his family made it a breeze. Michael loves being hands-on. He makes sure Marlo's school has his contact information and makes sure to get familiar with school staff. He loves teaching our son essential life skills, taking him on hikes and getting him up for school with positive quotes for the day to name a few. If nothing else, he's a great father, something no one can take away from him. He enjoys being a father and he's Marlo's superhero. Everything that he does is raise our son to be an outstanding young man." (Ex. 7).

Although there is no court-ordered child support, Michael pays Alea $500 a month, in addition to whatever "other things" Marlo needs. (Ex. 1). Michael and Alea have worked out a joint custody agreement between themselves, in which Marlo lives with his dad from Thursday after school until Sunday evening. (PSR, ¶58). On Sunday evening, Marlo returns to his mom. (PSR, ¶58). Michael describes Thursday as "the best day of the week." (Ex. 1). He says Sunday is "the saddest day of the week." (Ex. 1).

17

When Marlo is with Michael, they spend as much time as possible together. Marlo takes swimming lessons, piano lessons, and plays soccer. (Ex. 1). Pop tarts are his preferred snacks. (Ex. 1). Michael takes Marlo to and from school, helps him with his homework and ensures that he is on time to after-school activities and lessons. (Ex. 1). When they are home, Michael helps Marlo with homework, watches television and reads with him, and cooks dinner for him, especially Marlo's favorite, chicken tacos. (Ex. 1). Michael has recently been showing Marlo how to make sandwiches with "the big knife." (Ex. 1). Michael is teaching his son life skills in an effort to make Marlo more independent and less reliant on his parents. Being independent and making his own decisions are a few examples of how Michael is preparing his son for life in the wake of Michael's impending incarceration.

Marlo loves horror movies, roller coasters, swimming and water parks, especially the water parks that are attached to hotels where they can spend the night. (Ex. 1). Marlo enjoyed the thrill of roller coasters so much that Michael bought a season pass to Six Flags. (Ex. 1). The thought of being away from Marlo for an extended period of incarceration is devastating for Michael. (Ex. 1).

There is an expanding body of research as to the impact an imprisoned family member has on a child. As of 2023, "there were some 4 million children under the age of 18 in the United States who had a parent, sibling, or other family member imprisoned. These youngsters represent 5.8% of the U.S. population under 18. The true figure may be considerably higher, according to a 2022 study that made use of longitudinal links between survey and administrative data from 13 U.S. states. It found that 8.8% of children are exposed to a parent or other potential caregiver in prison by age 18."[12] Moreover, "Children who grow up in families in which a parent has been

---

[12] Nicholas Zill, *When A Parent Goes To Prison, What Happens To The Kids?,* Institute of Family Studies, (March 18, 2025) https://ifstudies.org/blog/when-a-parent-goes-to-prison-what-happens-to-the-kids

imprisoned are more likely to experience learning, behavioral, and emotional difficulties. They get lower grades in school. Their parents or guardians are contacted more often by teachers because of the student's misbehavior or academic struggles. They act in ways that lead counselors to describe them as anxious or depressed, or as having attention deficit hyperactive disorder (ADHD)."[13]

According to the National Institute of Justice, "Children whose parents are involved in the criminal justice system, in particular, face a host of challenges and difficulties: psychological strain, antisocial behavior, suspension or expulsion from school, economic hardship, and criminal activity. It is difficult to predict how a child will fare when a parent is intermittently or continually incarcerated, and research findings on these children's risk factors are mixed."[14] Recent data has shown that "nearly two million minor children in the United States have an incarcerated father at any given time" and the impact of having an incarcerated father created harm to cognitive development significant enough to contribute to overall Black-white achievement gaps in school.[15] There are massive racial disparities in the rate at which children experience parental incarceration. "Nearly 7 percent of school-aged Black children have a parent currently in prison, while the same is true of 2.4 percent of Hispanic children and less than 1 percent of white children. This adds up to one in four Black children dealing with parental incarceration by age 14. By contrast, less than 4 percent of white children have the same experience." [16] From there, one study's "findings 'suggest that the incarceration of a father significantly limits their child's reading comprehension, math problem-solving, and

---

[13] *Id.*

[14] Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children,* National Institute of Justice, (March 1, 2017)
https://nij.ojp.gov/topics/articles/hidden-consequences-impact-incarceration-dependent-children

[15] Laura Clawson, *What Happens to Kids' Learning if Dad Is Incarcerated?* JSTOR Daily, (July 19, 2025)
https://daily.jstor.org/what-happens-to-kids-learning-if-dad-is-incarcerated/

[16] *Id.*

19

memory/attentional capacities in middle childhood,' amounting to the equivalent of one-to-two months of schooling lost."[17]

Michael continues to play a critical role in his son's life. Reverend Darrell L. Phillips, Ordained Minister and Ret. Executive Assistant-Office of the Chief Executive Officer of the Chicago Public Schools, is a family friend. He writes, "Michael became a proud father to Marlo Bentley in 2016. He loves being a dad. Michael and Marlo's mother share parenting duties equally. Marlo stays with Mike three to four days out of the week. Marlo attends Pershing Magnet Elementary School located in Bronzeville. He is currently studying classical piano and learning to swim. As a second grader, Marlo is a proficient speller and the winner of two spelling bees." (Ex. 12).

Michael's father echoes this sentiment. "[Michael is] a proud father of an eight-year-old son. Even though he is no longer with the mother after 10 years, he still provides for his son and actually provides parental care three days of the week. He is committed as a father to raising his only child and being there for his growth and educational development. Marlo, his son, takes piano lessons and spends Friday through Sunday with his dad, who adjusts his work schedule to be with him. He and Marlo's mother are working to get Marlo into Bronzeville Classical, where he can get a first class elementary school education. After Marlo won his 2nd grade spelling bee last year, he went on to compete against eighth graders in an all school spelling bee, where he placed sixth. Mike wants to be able to continue to shape his son's life, developing integrity, self-confidence and a sound work ethic. Mike believes that self-confidence is important for Marlo so he can withstand peer pressure, which he believes negatively impacted himself. He is providing Marlo with values and an understanding of respect for others. He is doing a yeoman's job of building a young Black man from the inside out." (Ex. 4).

---

[17] *Id.*

Finally, Michael's mother writes, "I observe Michael as always the family man-a loving father to his bright son, who is his heart. Michael sacrifices. He gets up in the wee hours in the morning to get his load to travel hundreds of miles so he can be back home in time to pick up his son from school. Michael teaches him math, sports, sportsmanship, morals, hiking, manners, more. Wonderful father who is able to do everything for his son. He receives notoriety at his jobs with safety awards and dinners thrown in his honor for being the trustworthy man and driver who they can always depend on. Michael walks the path he wants his 8-year-old son to travel about truth and constructive life choices and decisions. A path with Heart-God. I've never been more proud of Michael for the father, brother, son, man that he is today and tomorrow." (Ex. 2). Michael's role as a father in his young son's life is why the requested sentence is appropriate.

> **G. Michael has plans for the future, which include returning to his work as a truck driver, reconnecting with his loved ones, learning from the events that led to his involvement in this case, and continuing to evolve as a changed man**

Michael has unequivocally changed his life and his outlook since his arrest on this case. He looks forward to continuing to grow and learn from his mistakes. Michael has come to understand that his federal arrest in 2020 had a "big impact on him and was the beginning of his "journey of self-redemption and reflection." (PSR, ¶74). He says has experienced an "evolution of moods" since his arrest, "including initial anxiety, shame and regret, followed by remorse, strength and redemption." (PSR, ¶74). He believes he has "found" himself and experienced an "expansion of consciousness." (PSR, ¶74).

21

Despite the intrinsic stress of the pending case, Michael is trying to turn a negative experience into something positive. Since his arrest in this case and with his father's encouragement, Michael enrolled in truck driving school. Michael completed the program on September 16, 2020 and obtained his Commercial Driver's License. (Ex. 6) Since then, he has been making a living driving a truck. Michael has been employed by the following companies : New Age Transport, 2020-2021; Fonfara Trucking, 2021-2022; Natex Trucking, 2022-2023; General Express, 2023-2024; DMK Express, 2024-2025 to the present. (PSR, ¶91-¶95). Michael understands that once this case is behind him, he will again need to support himself and Marlo. Working as a truck driver will allow him to achieve this goal and is one component of his life which has allowed Michael to move forward, feel valued, and appreciated.

In regards to his future goals, Michael wishes to continue to try to right his wrongs, be the best father, and be a better son. (PSR, ¶75. He expressed a desire to have this situation "behind [him]," so he can be involved in his son's life and ensure his son does not follow in his footsteps. (PSR, ¶75).

Michael is ready to accept the consequences of his actions. He has gained a better understanding of himself during the pendency of this case. (PSR, ¶75) Most importantly, Michael wants to live a normal life, without this case hanging over his head. (Ex. 1). He sees this as a life where he can engage with his parents and embrace his son. (Ex. 1). He acknowledges there will be challenges along the way, but Michael is convinced he can overcome anything that comes his way.

22

**II.** **A SENTENCE OF 24 MONTHS, FOLLOWED BY SUPERVISED RELEASE, AFFORDS ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, IS JUST PUNISHMENT, PROMOTES RESPECT FOR THE LAW, PROTECTS THE PUBLIC FROM FURTHER CRIME, AND OTHER POLICY CONSIDERATIONS**

Under 18 U.S.C. §3553(a), the court must consider a number of factors in determining an appropriate sentence, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crime. A sentence of 24 months serves each of these purposes. This sentence, coupled with Michael's background and outlook, ensures he will not reoffend, reflecting the needs of deterrence, just punishment, and protecting the public are all satisfied.

**A. Michael's background, education, employment history, and age reflect that he has a low risk of recidivism**

A useful predictor of future behavior is past conduct. Michael's age, education, lack of criminal history, consistent employment, reflections about his future, and behavior since his arrest all support that he has a low rate of recidivism. These factors, in turn, show that the requested sentence is just punishment, provides adequate deterrence and protects the public.

Age, education, and criminal history influence the rate of recidivism. According to studies, age has exerted a strong influence on recidivism across all sentencing categories. Older offenders were less likely to recidivate after release than their younger offenders who had served similar sentences, regardless of the length of time imposed. At the time of sentencing, Michael will be almost 37 years old. Given Michael's age, it is statistically unlikely he will ever reoffend. According to the Council on Criminal Justice, older people return to prison at lower rates. The Federal Bureau of Justice Statistics (BJS) publishes statistics on recidivism every three years.[18] It

---

[18] *Recidivism Rates: What you need to know,* Council on Criminal Justice (Sept. 1, 2021) https://counciloncj.org/recidivism_report/

is "one of the most well-established facts in criminal justice that people 'age out' of crime."[19] This study reflects that "people released at age 24 or younger were 64% more likely to be reincarcerated at year five (56.8%) than those released at age 40 or older (36.3%).[20] Even if Michael is not 40 at the time of his release, his statistical likelihood of reoffending is far closer to that age than the younger age of 24. Elderly prisoners have the lowest recidivism of any age group.[21] By 50 to 64, recidivism rates drop to 5%, "reaching less than 1% by age 65."[22] Courts have taken these recidivism statistics into account, also taking into account that the length of time until an individual's first offense, also reflects a low rate of recidivism.[23] *United States v. Hanson,* 561 F. Supp.2d 1004 (E.D. Wis 2008) (downward departure when defendant was 49 years old, "had no prior record whatsoever" and "he had never been to jail for even one day"). *United States v. Ward,* 814 F.Supp. 23 (E.D. Va 1993) (finding that the guidelines do "not account for the length of time a particular defendant refrains into criminal conduct" and departing downward based on defendant's age).

Education combined with age is also statistically significant when considering recidivism rates. For example, among offenders under age 30 at the time of release, college graduates had a substantially lower rearrest rate (27%) than offenders who did not complete high school (74.4%).[24] While Michael did not complete his education, he originally attended Florida A&M in Tallahassee, Florida as a student in their 5 year MBA program on an academic scholarship. After about three years, he left Florida A&M for DePaul University in Chicago, to be closer to his

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] At 30, on May 17, 2021, Michael pled guilty to possession of a controlled substance, for which he was sentenced to two years probation. On May 17, 2023, probation was terminated satisfactorily. (PSR, ¶37).
[24] *The Effects of Aging on Recidivism Among Federal Offenders,* United States Sentencing Commission (Dec 7, 2017)
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2017/20171207_recidivism-Age.pdf

24

family, where he was only a few credit hours short of graduation. Money for tuition was the only obstacle that stood in the way of Michael earning a degree. In any case, Michael's education progressed far beyond that of a high school graduate.

Lack of criminal history also plays a considerable role in lowering the rate of recidivism. Michael has very limited criminal history. Courts have held that individuals who have never been imprisoned do not need lengthy prison sentences in order to be deterred from future crime. *United States v. McGee,* 479 F.Supp.2d 910 (E.D. Wis 2007) (below guidelines sentence given in part because the defendant "had never been to prison and 'generally a lesser period of imprisonment is required to deter a defendant who has already served some serious time yet continues to reoffend.'"); *United States v. Qualls,* 373 F.Supp.2d, 873, 877 (E.D. Wis 2005). A combination of age, education, and lack of criminal history, as well as employment history, discussed above, makes it extremely unlikely Michael will ever recidivate, which is why the requested sentence is appropriate.

**B. Michael's own attitude reflects that he has a low risk of recidivism**

Even without the above statistics, Michael's own attitude and behavior since his arrest indicate that he has a low rate of recidivism. Michael never imagined that he would be facing a prison term at any point, much less at 36-years-old. He is still adjusting to this exhausting and painful reality and the rippling effect of his acts. In some ways, Michael recalls feeling "relieved" when he was finally "caught," since he was able to break with the life that led to these charges, without fear of repercussions from those he was involved with.

With his increasing involvement with the individuals and in the events that led to these charges, Michael could see no way out. He says, "I always owed money. I kept owing more and more money. This was by design. I wanted to stop but I could not stop. I was in so deep and these people would not take no for an answer." (Ex. 1). Michael has come to realize that no

25

matter how deeply you are involved in illegal activity, there is always a way out. Michael says, "Once busted, I had to stop. I was kind of grateful when it happened." (Ex. 1). Since then, Michael has completely changed the trajectory of his life by trying to benefit the lives of others and not only focusing on himself. Michael understands that he should have extricated himself from this situation long before he had contact with the FBI and other federal agencies on February 20, 2020, and for that he is extraordinarily sorry. (Ex. 1). The overwhelming guilt he carries with him provides deterrence. Michael never wants to live through anything like this again.

Michael is profoundly remorseful for the ongoing effect his actions have had on those whom he loves. At some point, Michael does not recall the exact date, but sometime around the time of his arrest, his family staged an intervention. (Ex. 1). It's been years ago. Though even now, he cannot escape the deep-seated sense of embarrassment and humiliation he felt. (Ex. 1). He marks it as one of the worst experiences of his life, along with his arrest. (Ex. 1). Although Michael cannot remember what was said, he knows his parents were "really upset" with him. He cannot forget the shame that his parents felt when they were forced to confront him with the devastating turn his life had taken. (Ex. 1).They had always been so proud of him. (Ex. 1). Facing them rocked his world. This is an occurrence that Michael never wishes to repeat. This provides deterrence.

Before this case, Michael had not spent a single day in prison, so any amount of time will be particularly onerous. Michael is trying to imagine the numerous and unfamiliar rules he will have to follow. These are the rules and schedules which govern every aspect of a detainee's life, which will now be his life: the total lack of privacy; when to wake up; when to go to sleep; when to shower; when to go to rec; when to go to religious services; when to watch television; when to

26

use the phone; when and how to get visitors; and when to get an anticipated moment of peace and quiet. Michael experienced a loss of appetite and difficulty sleeping when he was initially arrested, even though he was living at home. (PSR, ¶74). He expects a resurgence of these issues when he is locked up. Once Michael has a life beyond prison walls, he will have no desire to ever return to a custodial existence.

Michael knows that at some point, he will have to explain to Marlo why his father has been away from him. (Ex. 1). Marlo was just a baby when Michael became involved in this case. At the time, Michael did not consider the consequences his actions would have on his son. (Ex. 1). These consequences can never be erased. Michael has been telling Marlo "a little bit," but as Marlo gets older, Michael knows his son will want answers. (Ex. 1). This is not a conversation Michael relishes but he will also be able to teach his son that when you do something wrong, you must take responsibility for that wrong, admit it, learn from it, and not let it define you. (Ex. 1). While this will be a teaching moment, it is a conversation Michael wishes were not necessary. Michael knows he will be saddened to be away from Marlo as he reaches pivotal milestones in his life. (Ex. 1). But Michael also knows that he will find strength in his son upon his release. Michael will never again be away from Marlo for an extended period of time. (Ex. 1). His love for and his relationship with his son provide deterrence

Michael has begun to confront his own mortality. He knows he is looking at some period of time away from his loved ones. He understands his world will most likely be different when he is released from custody. Of course, he will be older and Marlo will be older as well. But Michael also worries about his parents, who are both in their 70s. (Ex. 1). His mother has suffered from varying health issues for decades. He does not know whether either of his parents will be around when he is released from prison. (Ex. 1). He knows this case has caused both of

27

them immeasurable stress and for that he is deeply remorseful.

Michael continues to process the ramifications of all he has done, all he has lost that can never be recovered, and the impact his actions have had on those he cares for and those whom he has never met. (Ex. 1). He has a deep feeling of regret. (Ex. 1). Michael says, "I realized that all the time I had been destroying and not building. Even if I hadn't forced someone to do drugs, I still took part in their demise. I felt that I was still a catalyst of their chaos that children may have been subject to." (Ex. 1). Michael knows he cannot escape responsibility for how he may have contributed to others' drug use and addiction. (Ex. 1). For this, Michael is extraordinarily sorry. Michael accepts that he has no one to blame but himself. He also knows that he will never again violate the law or put himself in a position to endanger his freedom. Once this case is behind him, he will not recidivate.

III.     **ENHANCEMENTS TO THE BASE OFFENSE LEVEL OVERSTATE MICHAEL'S CULPABILITY AND DRIVE THE GUIDELINES**

Both the drug amount and the alleged gun possession greatly increase Michael's base offense level. Neither the drug amount or the alleged gun possession accurately reflect Michael's culpability and inflate the guidelines range to a level beyond what the purposes of punishment reflect. The court should take the gun enhancement and the drug amount, and their lack of connection to Michael's actual culpability into account under § 3553(a) when sentencing Michael.

**A. Two point enhancement for gun possession overstates Michael's culpability**

Paragraph 20 of the PSR, and the government's position in the plea agreement, both argue that Michael receives two additional points to the base offense level based on two weapons found in a vehicle that Michael gave officers consent to search on February 19, 2020. Application Note 11 to 2D1.1 explains that "[t]he enhancement for weapon possession in

28

subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." A search warrant was executed on Michael's apartment on February 18, 2020. The indictment alleges a number of drug possessions, the last date which is February 18, 2020. Yet the possession of these weapons is February 19, 2020, after any of the charges in this indictment occurred. There is no evidence that Michael ever actually used these weapons during any of the charged drug possessions, nor that he brandished these weapons, had them on his person, or engaged in any personal use connected with these transactions. Not even the date officers found these weapons connect with the dates charged in the indictment. Therefore, this court should, under §3353(a), take into account the two points Michael receives for alleged possession of these weapons, and consider that these weapons found in a vehicle do not reflect his culpability and are not explicitly tied to the charged offenses.

### B. Drug amount drives guidelines and overstates Michael's culpability

Courts across the country have consistently stated how the guidelines for drug offenses are so driven by the amount of narcotics that they can easily, and often do, overstate an individual's actual culpability in the crime charged. *United States v. Dossie*, 851 F.Supp.2d 478 (E.D.N.Y. 2012) ("the drug-offense Guidelines ranges are excessively severe. In formulating those ranges, the Commission decided to jettison its pre-Guidelines data and instead chose to make the sentencing range in every single drug case proportional to the onerous mandatory sentences meant only for leaders and managers"); *United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) ("I will place almost no weight on [the guidelines' calculation] because

of my fundamental policy disagreement with the offense guideline that produces it… The flaw is simply stated: the Guidelines' ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more. Instead, they are driven by drug type and quantity, which are poor proxies for culpability."); *United States v. Woody*, 2010 WL 2884918, at *9 (D. Neb. July 20, 2010) (in drug cases, quantity "is not always a trustworthy measure of the culpability of an individual defendant"); *United States v. Thomas*, 595 F.Supp.2d 949 (E.D Wisc. 2009) at note 1 ("commentators have long criticized that the guidelines' heavy reliance on drug weight rather than the defendant's role in the offense [citing many articles]"); Michael Tonry, *The Functions of Sentencing and Sentencing Reform*, 58 Stanford L. Rev 37, n. 17 (Oct. 2005) ("73.7% of district judges and 82.7% of circuit judges said that federal drug-trafficking sentences are inappropriately severe."). The drug amount in this case drives Michael's guidelines and overemphasizes drug amount in comparison to the specific actions and personal history and characteristics of Michael.

## IV.    THE PSR

The sentencing recommendation submitted by probation discusses the possibility of violent conduct, which can sometimes accompany drug sales, although that did not happen here. Probation opines, "Drug trafficking offenses are also serious offenses as violent acts often accompany the activity. While there is no evidence of Defendant Bentley being involved in violent acts, he had the means to engage in or facilitate the violence that is common in drug trafficking, as he possessed two firearms in one of the vehicles he used to transport drug packages to the post office." (Sent. rec., p. 3) Without addressing the substance or veracity of drug trafficking leading to violence, violence was not a factor in any way in this case. There are no allegations that Michael ever used a gun, pointed a gun, displayed a gun, brandished a gun, or

30

threatened anyone with a gun. To consider something that *might* have occurred, because, in theory, Michael had the means to do so is improper and should not be considered by this court.

## V.    OBJECTIONS TO PRESENTENCE REPORT

Paragraph 43 describes a 2010 arrest in Florida which was dismissed, and paragraph 48 describes a 2024 Georgia arrest and subsequent case which was also dismissed. Michael objects to the inclusion of both of these paragraphs in the pre-sentence report. Michael was not the individual arrested or charged in these cases, and the government will be unable to show that he was. Therefore, these two arrests should not be included in the PSR.

## VI.    CONCLUSION

Wherefore, based on the above arguments in mitigation, a sentence of 24 months is sufficient but not greater than necessary.


Respectfully submitted,

s/ Jonathan S. Bedi
Jonathan S. Bedi
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1101
Chicago, IL 60604
(312) 525 2017
jbedi@bedisinger.com

31

## **Certificate of Service**

I, Jonathan S. Bedi, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Jonathan S. Bedi
Jonathan S. Bedi

32